UNITED STATES of America, Appellant,

v.

Leo Lyle LAWRENCE, also known as Bud Lawrence, Appellee.

No. 94–2274.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1994.

Decided March 30, 1995.

Rehearing Denied June 20, 1995.*

* McKay, Circuit Judge, would grant the petition for rehearing.

Elizabeth Lohah Homer, Dept. of Justice, Washington, DC, argued, for appellant.

Kenneth E. Jasper, Rapid City, SD, argued, for appellee.

Before McMILLIAN, Circuit Judge, McKAY,** Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

The government appeals an order of the District Court [1] granting the defendant's motion to dismiss for lack of subject-matter jurisdiction an indictment charging the defendant, Leo Lyle Lawrence, with abusive sexual contact, a violation of 18 U.S.C. §§ 1152 and 2244(a)(3) (1988). We affirm.

## I.

■ Under the Indian Country Crimes Act, codified at 18 U.S.C. § 1152, federal courts do not have jurisdiction over offenses committed within Indian country unless either the defendant or the alleged victim is Indian. *See Duro v. Reina,* 495 U.S. 676, 680 n. 1, 110 S.Ct. 2053, 2057 n. 1, 109 L.Ed.2d 693 (1990); *United States v. McBratney,* 104 U.S. 621, 624, 26 L.Ed. 869 (1882). In the present case, it is undisputed that the alleged abusive sexual contact occurred in Indian country and that Lawrence is non-Indian. Based on stipulated facts and testimony adduced at an evidentiary hearing, the District Court determined that the alleged victim is also non-Indian for purposes of establishing federal criminal jurisdiction, and granted the defendant's motion to dismiss for lack of jurisdiction. On appeal, the government challenges the District Court's determination that the alleged victim is non-Indian.

We first address the issue of the appropriate standard of review in this case. Lawrence's brief does not take a clear-cut position on the issue. The government argues for *de novo* review on the ground that the District Court's determination of the alleged victim's status as an Indian or a non-Indian is a legal conclusion. The government acknowledges, however, that this Circuit has on occasion employed a clear-error standard of review in subject-matter jurisdiction cases involving diversity of citizenship. *See Dunlap v. Buchanan,* 741 F.2d 165, 167 (8th Cir.1984); *Holmes v. Sopuch,* 639 F.2d 431, 434 (8th Cir.1981); and *Rogers v. Bates,* 431 F.2d 16, 18 (8th Cir.1970).[2]

■ We conclude that the diversity-of-citizenship cases are inapposite here. When an action is brought in federal court on the basis of diversity jurisdiction, the question whether complete diversity of citizenship exists as required under 28 U.S.C. § 1332(a) (1988) is generally a straightforward question of fact. It therefore is not surprising that the clear-error standard of review has been applied to determinations that subject-matter jurisdiction based on diversity of citizenship either has or has not been established. In contrast, the present case calls for a conclusion as to whether a particular person qualifies as an "Indian" for purposes of federal criminal jurisdiction. While many subsidiary facts may go into this determination, we believe that ultimately the determination of Indian or non-Indian status is a conclusion of law.

■ In *Falls v. Nesbitt,* 966 F.2d 375 (8th Cir.1992), we held that where our decision "is predominantly one of determining *whether the established facts fall within the relevant legal definition* ... we apply a de novo standard of review." *Id.* at 377 (emphasis added); *see also Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 256 (8th Cir.1994) (reviewing *de novo* whether employee benefit plan was an "ERISA" plan for purposes of subject-matter jurisdiction). Like *Falls,* the present case requires the application of a legal definition to established facts. Were any of the facts upon which the legal deter-

---

** The HONORABLE MONROE G. McKAY, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation.

1. The Honorable Andrew W. Bogue, Senior United States District Judge for the District of South Dakota.

2. *But see Blakemore v. Missouri Pacific Ry. Co.,* 789 F.2d 616, 618 (8th Cir.1986), which appears to confine clear-error review to the district court's underlying fact-finding, rather than to the ultimate question of diversity *vel non.*

mination must be made in dispute, we would apply the clear error standard of Fed. R.Civ.P. 52(a) to our review of the subsidiary findings made by the trial court. *See Blakemore v. Missouri Pacific Ry. Co.*, 789 F.2d 616, 618 (8th Cir.1986). Here, the underlying facts have been established in part by stipulation and in part as a result of findings made by the District Court after an evidentiary hearing. The government does not challenge any of the District Court's subsidiary findings as clearly erroneous. What the government does challenge is the District Court's conclusion that the established facts, when added together, do not result in an "Indian" for purposes of federal criminal jurisdiction. Our review of that conclusion is *de novo*. *See Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 470 (8th Cir.1993) (*de novo* review appropriate where subject-matter jurisdiction is at issue and facts are undisputed).

## II.

In determining whether the alleged victim in this case is Indian, the District Court followed the rule set out in *United States v. Rogers*, 45 U.S. (4 How.) 567, 572–73, 11 L.Ed. 1105 (1846), that for purposes of federal criminal jurisdiction, an Indian is a person who (1) has some Indian blood; and (2) is "recognized" as an Indian by a tribe or by the federal government. *See also United States v. Torres*, 733 F.2d 449, 456 (7th Cir.), *cert. denied*, 469 U.S. 864, 105 S.Ct. 204, 83 L.Ed.2d 135 (1984); *United States v. Dodge*, 538 F.2d 770, 786 (8th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 1119, 51 L.Ed.2d 547 (1977). The District Court presumed that the alleged victim of the offense, who is $^{11}/_{128}$ths Oglala Sioux Indian[3], has the requisite quantum of Indian blood under the first part of the *Rogers* inquiry, and proceeded directly to the question of whether the

alleged victim was "recognized" as an Indian by an Indian tribe or the federal government.

■■■ The Court's "recognition" analysis was guided by consideration of four factors it first enunciated in *St. Cloud v. United States*, 702 F.Supp. 1456 (D.S.D.1988). Those factors, which the Court considered in declining order of importance, are: 1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life. *Id.* at 1461.

Although the government now takes issue with the third and fourth elements of the *St. Cloud* inquiry, no such objection was raised in the District Court, and the government argues in its opening brief that the victim of the offense is Indian precisely because she satisfies each of the *St. Cloud* criteria. Not until the reply brief did the government first challenge the District Court's use of the *St. Cloud* approach. Because the government's attack on the *St. Cloud* factors comes after long acquiescence in the use of those factors in this case, the attack is not properly before us and we decline to review it. As did the District Court, we take *St. Cloud* as supplying the framework for our examination of the facts, and we review *de novo* that Court's conclusion that the alleged victim is non-Indian for purposes of federal criminal jurisdiction.[4]

### A.

■■■ As to the first *St. Cloud* factor, the parties stipulated that the alleged victim was not an enrolled member of the Oglala Sioux Tribe or any other Indian tribe. The government makes much of the fact that the alleged victim would become eligible for tribal enrollment once she completed the tribe's

---

**3.** The alleged victim's mother is $^{11}/_{64}$ths Oglala Sioux Indian, and her father is from Saipan. Although the mother is an enrolled member of the Oglala Sioux Indian tribe, she has lived most of her life away from the reservation.

**4.** We note that the third and fourth elements of the *St. Cloud* inquiry appear to be nothing more

than elaborations of the *Rogers* tribal-recognition factor, and thus appear to fit comfortably within the broad framework of the *Rogers* formulation. Were we to reach the question, we would be inclined to hold that the government's attack on these *St. Cloud* elements lacks merit.

one-year residency requirement. This argument misses the point. An individual who has not completed the requirements for tribal enrollment cannot be considered eligible. Further, as the District Court correctly observed, the time of the offense is the most appropriate point at which to gauge a victim's status as an Indian. At that time, the alleged victim was not an enrolled member of any tribe and was not eligible for tribal enrollment. Thus, she did not satisfy the first *St. Cloud* factor.

### B.

The District Court also determined that the alleged victim did not satisfy the *St. Cloud* government-recognition factor. The government asserts that this factor is satisfied by the alleged victim's receipt of medical treatment from the Indian Health Service, and by her receipt of school books under the federal Johnson–O'Malley Act. The District Court concluded otherwise based on undisputed evidence that the alleged victim was ineligible for medical treatment from the Indian Health Service in her own right, and that she had mistakenly been provided with the Johnson–O'Malley Act assistance while ineligible. We believe that the District Court correctly determined that the alleged victim did not satisfy the second *St. Cloud* factor.

### C.

The District Court next concluded that the alleged victim did not satisfy the third *St. Cloud* factor, namely, enjoyment of the benefits of tribal affiliation. This factor, like the tribal-enrollment and social-recognition factors, goes to the question of tribal recognition of Indian status. The government presented undisputed evidence that seven months prior to the alleged sexual abuse, the Oglala Sioux Tribe had taken custody of the alleged victim under the authority of the Indian Child Welfare Act, 25 U.S.C. § 1911 ("the Act"), and had placed her under the care of her grandmother, an enrolled member of the Tribe. However, the Court deemed this act insufficient to satisfy the third factor, especially in light of the fact that the alleged victim is ineligible for tribal benefits such as distributions. We agree with the District Court's analysis.

As the dissent suggests, a tribe's intervention in a child custody proceeding under the Act might in some cases be deemed tribal recognition of the child as an Indian. Nevertheless, in the circumstances of this case, we do not believe that the Tribe's actions amounted to tribal recognition. The record reflects that prior to the Tribe's intervention, the alleged victim and her siblings were on vacation with their step-father in Nevada when the step-father was arrested there. The State of Nevada took custody of the alleged victim and her siblings and placed them in foster care on August 14, 1992. About a month later, on September 18, an individual from the Indian Center in Las Vegas contacted the administrator of the Indian Child Welfare Program for the Oglala Sioux Tribe with respect to intervening on behalf of the alleged victim and her siblings. Subsequently, the Tribe agreed to become involved in transferring the alleged victim and her siblings from foster care in Nevada to their grandmother's care in her home on the Oglala reservation.

Under the Tribe's own standards the alleged victim was neither an enrolled member nor at that time eligible for enrollment. She could become eligible only by completing the one-year residency requirement. Moreover, because of her age, the alleged victim had the right, pursuant to Bureau of Indian Affairs guidelines,[5] to object to the transfer to South Dakota, regardless of the actions of the Tribe. In this case, the alleged victim never was apprised of her right to object to the transfer, a fact that casts doubt upon the legality of the transfer and thus upon the significance of any recognition conferred thereby. In fact the Tribe did little more than contact the alleged victim's grandmother who wished to assist the alleged victim by taking the child into her home. The alleged victim was flown, at the State of Nevada's expense, to South Dakota, where she was picked up at the airport by her grandmother. The Tribe's minimal involvement with the

---

5. Guidelines for State Courts; Indian Custody Proceedings, 44 Fed.Reg. 67,584 (1979).

child casts doubt upon the significance of any recognition conferred by the Tribe's actions in connection with the transfer.

In addition, we note a further difficulty that attends according significance to any recognition conferred by the Tribe's actions. The Act defines an Indian child for purposes of the Act as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (1988). Here, when the alleged victim was transferred from Nevada to South Dakota, she was unmarried and under age eighteen, but otherwise she did not meet any part of the Act's definition of "Indian child." Thus, the Tribe's intervention on the alleged victim's behalf was undertaken without a proper basis under the Act. We believe that the Tribe's spurious use of the Act to bring the alleged victim from Nevada to her grandmother in South Dakota is entitled to little weight, and does not constitute "recognition" of the alleged victim as an Indian. Thus, the District Court did not err in concluding that the third *St. Cloud* factor had not been satisfied.

### D.

Finally, the District Court concluded that the alleged victim is not recognized socially as an Indian. The parties stipulated, among other things, that the alleged victim was born off the reservation; that except for one seven-month period immediately preceding the alleged abusive sexual contact, she had lived her entire life off the reservation; that she did not attend pow-wows, Indian dances or other Indian cultural events; and that she and her family lived without focusing on their Indian heritage. These stipulated facts sustain the District Court's determination that the alleged victim failed to satisfy the fourth *St. Cloud* factor.

### III.

Having considered the question *de novo*, we agree with the District Court's conclusion that the alleged victim is a non-Indian for purposes of federal criminal jurisdiction. Accordingly, the District Court's dismissal of the indictment for lack of subject-matter jurisdiction is affirmed.

McKAY, Circuit Judge, dissenting.

I respectfully dissent. I agree with the majority that the determination of one's status as an Indian is ultimately a question of law subject to *de novo* review by this court. I must, however, depart from the majority's resolution of this admittedly close question. I conclude that the alleged victim in this case is an Indian under the rule of *United States v. Rogers,* 45 U.S. (4 How.) 567, 572–73, 11 L.Ed. 1105 (1846). I would therefore reverse the District Court and order the indictment reinstated.

Under *Rogers,* federal criminal jurisdiction exists if a victim has some Indian blood and is "recognized" as an Indian by the federal *or tribal* government. *Id.* at 572–73. The majority presumes, and I conclude, that this child, who is by ancestry $^{11}/_{128}$ths Oglala Sioux, meets the first prong of the *Rogers* test. Her status thus turns upon the degree to which she has been recognized as an Indian by tribal or federal government. The child was admittedly not an enrolled member of the Oglala Sioux at the time of the alleged crime. Tribal enrollment is not, however, the *exclusive* method by which a tribe may confer official recognition of an individual's status. I believe that the actions taken by the Oglala Sioux tribal court on behalf of this child compel the conclusion that she has in fact been "recognized" as an Indian by the tribal government.

Some months prior to the alleged sexual assault, the Oglala Sioux, acting through the tribal court, affirmatively intervened to assume responsibility for the care and protection of this girl. The child had been abandoned in Las Vegas and had subsequently been relegated to a shelter there. Acting at the request of the child's grandmother, who was unable to act herself on behalf of the child, the tribe asserted its right of intervention under 25 U.S.C. § 1911 and acquired jurisdiction over the custody proceedings. The Oglala Sioux tribal court exercised its authority to make the girl a ward of the court and she was moved from Nevada to the

Oglala Sioux reservation. The tribal court then placed her in the care of her grandmother.

The majority, although attributing some importance to the actions of the tribal court, minimizes their significance by relegating its consideration of those actions to the third (and third least important) prong of the framework suggested in *St. Cloud v. United States,* 702 F.Supp. 1456 (D.S.D.1988). While I accept the *St. Cloud* factors as a nonexhaustive enumeration of relevant considerations, I believe that the majority missteps in characterizing the tribal court's role in this girl's life as "enjoyment of the benefits of tribal affiliation."[1] I readily acknowledge that the intervention of the tribal court markedly enhanced this child's life by rescuing her from a state foster facility in Nevada. Beneficence notwithstanding, however, the symbolic implications of intervention and, more particularly, of wardship loom much greater than any gain received.

I therefore cannot help but conclude that the assumption and exercise by the tribal court of custodial and protective jurisdiction over this girl necessarily stands as official recognition by that court of her status vis-a-vis the Oglala Sioux.[2] *Rogers* requires no more. Comity suggests, and arguably compels, that we accord this action substantial deference. *Compare National Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) (comity compels federal courts to allow tribal court to make initial determination of its own jurisdiction); *Roman–Nose v. New Mexico Dep't of Human Servs.,* 967 F.2d 435, 437 (10th Cir.

1992) (state courts to give full faith and credit to tribal court custody determinations). I therefore respectfully dissent.

1. I note that the *St. Cloud* framework recognizes tribal enrollment as the only avenue of "official" tribal recognition. This strikes me as an unduly constricted interpretation of the term. Enrollment is undoubtedly the most authoritative form of official recognition; we would, however, slight a fellow court if we failed to acknowledge the adjudicatory authority of a tribal court to bestow "official" recognition.

2. The District Court, in weighing the significance of the tribal court's actions, speculated as to the motivations and intentions attending those actions: "[The authority of the tribal court was] used under the circumstances to 'rescue' the children from a bad situation because of the grandmother's status as a participating tribal member. There is no indication that ... the

tribe took the alleged victim 'under its wing'...." I am at a loss to understand the relevance to this inquiry of the District Court's speculations. Why the tribal court acted is of no importance given that it did in fact act; likewise, the intended implication of that action is of no consequence if the action itself constitutes official tribal recognition. The tribal court called upon its ancient and august prerogative to cloak this girl in the security of a wardship. It is not for this court or for the District Court to trivialize the responsibilities thereby assumed. We are no more free to lend significance to hypothetical assessments of the tribal court's mental processes than we are to attribute legal meaning to a psychological analysis of a Supreme Court opinion.